## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

**JANE DOE**                                    **CIVIL ACTION**

**VERSUS**                                       **NO.: 11-1532**

**FORMER THIBODAUX POLICE OFFICER**      **SECTION: R(5)**
**COREY MORRIS, ET AL**

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF
## MOTION FOR PARTIAL SUMMARY JUDGMENT
## ON VICARIOUS LIABILITY

**NOW INTO COURT**, through undersigned counsel, comes Plaintiff, **JANE DOE**, who respectfully submits the following Memorandum in Support of her Motion for Partial Summary Judgment on Vicarious Liability along with the attached exhibits.

### INTRODUCTION AND SUMMARY

Plaintiff was a 22-year-old French exchange student at Nicholls State University, living in Thibodaux, Louisiana, on August 27, 2010.  She was out having drinks with friends at two Thibodaux bars, Last Call and The Library, beginning on the evening of August 26, 2010.  Shortly after midnight on August 27, 2010, she became intoxicated and sick while at

Last Call.  She went outside with a male friend for fresh air, and they requested that Defendant, Corey Morris ("Morris"), who was on duty as a patrolman for the Thibodaux Police Department, in full uniform and in a marked police unit, drive her to her nearby on-campus apartment.

The Department concedes it had a custom and policy in place whereby its on-duty patrolmen would honor such a request when on duty.  Morris drove Plaintiff to her apartment, left his unit running in the parking lot with the lights on, assisted her out of his unit into her apartment, and held a cold, wet paper towel to her forehead as she lay in her bed.

Before leaving her apartment, Morris admittedly also inserted his penis into her mouth and vagina while standing beside her bed with his shoes still on, and his pants down, but not off, after briefly removing his Velcro duty belt which held his weapon, handcuffs and other equipment.  The intercourse, according to Morris, lasted less than two minutes.  He was in her apartment for about 30 minutes total, monitoring his police radio which he held with him the entire time.  He then left, entered his unit which remained running in the parking lot with headlights on, and he remained on duty until the end of his shift hours later.  He ultimately pled guilty to malfeasance in office.

**PLAINTIFF'S CLAIMS**

Plaintiff filed suit against Morris, The City of Thibodaux, Former Thibodaux Police Chief Craig Melancon, Thibodaux Mayor Charles Caillouet and The Thibodaux Police Department on the grounds that Morris's admitted actions were nonconsensual and constituted assault and/or battery and/or gross negligence on the part of Morris, that Morris was in the course and scope of his employment with The City of Thibodaux and The Thibodaux Police Department at the time of the offense, and that The City of Thibodaux and The Thibodaux Police Department are therefore vicariously liable for his actions.[1]  The above are claims under Louisiana state law brought pursuant to diversity jurisdiction.[2]

Plaintiff also asserted civil rights claims against the same defendants pursuant to 47 U.S.C. § 1983 and 1988, as well as the Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States, alleging that The Thibodaux Police Department and The City of Thibodaux had a longstanding practice and custom of allowing male officers to escort intoxicated females to their apartments or homes, alone and unsupervised, with deliberate indifference, actual and constructive knowledge that that custom or practice was

---

[1]Record Document #1, Complaint, paragraphs XII, XV, XXII.
[2]Record Document #1, Complaint, paragraph VII.

3

substantially certain to result in a constitutional violation, but consciously or deliberately disregarded that risk.[3]

Plaintiff asserts damages in the form of grief, humiliation, embarrassment, shock, horror, mental anguish, psychological and physical harm, loss of enjoyment of life, damage to her ability to maintain physical, emotional and intimate relationships, fear, lack of trust, past and future cost of professional counseling, punitive damages and attorney's fees.[4]

By way of amended complaint, Plaintiff added The Travelers Indemnity Company ("Travelers") as a defendant on the grounds that it provides coverage for any damages resulting from her claims against the above-referenced defendants. Travelers answered, denying coverage.

## THE ISSUE

The only issue of this motion is whether, under the undisputed <u>material</u> facts, The City of Thibodaux is vicariously liable for any liability found against Morris.

The facts <u>material</u> to this issue are undisputed. The only purported (but not material to the issue of this motion) factual dispute involves whether or not Plaintiff consented to Morris's actions. Morris claims that Plaintiff, who was ill and vomiting minutes before,

---

[3]Record Document #1, Complaint, paragraphs VIII, XVIII-XXI.
[4]Record document #1, paragraphs 23-24.

suddenly began seducing him into what he did while in the apartment.  Plaintiff, on the other hand, claims she was ill, semi-conscious and unable to move or talk, did not even know that Morris had entered her apartment, and has vague recollection of hearing his footsteps and the Velcro of his duty belt, then feeling him turn her over and place his penis in her mouth, none of it with her consent, and awakening soon afterward to realize she had been violated vaginally as well.  However, regardless of whose version of the facts involving consent is ultimately believed, the facts material to vicarious liability are undisputed.  For the reasons that follow, at all relevant times, Morris was acting within the course and scope of his employment with The City of Thibodaux as a matter of law.

### FACTS OF RECORD

### <u>Testimony of Plaintiff</u>

Born January 7, 1988, Plaintiff was a 22-years-of-age student at Nicholls State University at the time of the August 26, 2010, incident.[5]

That night she was out with friends at two bars, Last Call and The Library.[6]  At Last Call  she began feeling sick and threw up in the bathroom.[7]  She went outside with her friend

---

[5]Exhibit 1, Plaintiff Depo., pp. 7, 21.
[6]Exhibit 1, Plaintiff Depo., p. 64.
[7]Exhibit 1, Plaintiff Depo., p. 70.

Thomas to get fresh air and threw up again.[8] She saw a police officer outside of Last Call, asked him if he could drive her home since she was intoxicated, and he agreed.[9] Thomas was with her when she spoke to the officer.[10]  Thomas also helped her get into the police car.[11]

On the way, she felt sick, asked Morris to stop the car, which he did, and vomited outside the car without getting out.[12] He then proceeded to her apartment building, stopped the car and opened the rear door.[13]  She had trouble walking, and he assisted her up the steps to her second-floor apartment door where she also had trouble getting her key into the door lock.[14] She recalls opening the door, throwing her shoes in the kitchen and "crashing" on the bed.[15]

After that, she has trouble recalling the timeline well. She was intoxicated, and was hearing and feeling things, but could not move or interact with the things around her, and was unable to move her body.[16]  She does not recall Morris walking in, but recalls hearing the

_____

[8]Exhibit 1, Plaintiff Depo., pp. 72-72.
[9]Exhibit 1, Plaintiff Depo., pp. 75-77.
[10]Exhibit 1, Plaintiff Depo., p. 76.
[11]Exhibit 1, Plaintiff Depo., p. 77.
[12]Exhibit 1, Plaintiff Depo., p. 79-81.
[13]Exhibit 1, Plaintiff Depo., p. 83.
[14]Exhibit 1, Plaintiff Depo., p. 84.
[15]Exhibit 1, Plaintiff Depo., pp. 84-88.
[16]Exhibit 1, Plaintiff Depo., p. 88.

steps of someone walking and the sound of Velcro.[17] She was lying on her stomach, and felt

someone flipping her over and putting his penis in her mouth, but was unable to move or

resist.[18] She does not recall vaginal intercourse.[19]

> Q.     Do you recall any interaction with the police officer while you were in your apartment?
>
> A.     Okay. I remember a few things, but really few. Um, after I crashed on my bed, I don't know how long it was after that, but I heard steps, like someone walking.
>
> Q.     Steps where?
>
> A.     Um, going, like from I will say, like, just in front of my bedroom. Like, the door was wide open, so - - someone walking, I heard that. And I heard a sound of, like, the sound of the Velcro. And I was facing - - let me write it down for you?
>
> Q.     Sure.
>
> A.     When I crashed on my bed, I first turned that way. My face like that, against the wall. (Witness indicating.)
>
> Q.     To the corner?
>
> A.     Yes.

---

[17]Exhibit 1, Plaintiff Depo., pp. 89-92.
[18]Exhibit 1, Plaintiff Depo., p. 93.
[19]Exhibit 1, Plaintiff Depo., p. 93.

Q.      Why don't you write "bed" on there, just so we know
        what that is.

A.      Okay (Witness complies.)

        MR. McNAMARA:
                When you say to the corner, I mean, that could
        mean corner of the bed, corner of the room. Just so we
        have a clear - -

        MR. RIVIERE:
                Let me put it on the record.

        BY MR. RIVIERE:
Q.      How about the corner of the bedroom closest to the
        outside wall and the front door?

A.      Yes.

Q.      Okay.

A.      And I felt someone flipping me over.

Q.      Were you laying on your stomach?

A.      Oh, yes. And I felt someone flipping me over, and um - -
        sorry. (Whereupon the witness begins to cry.)

Q.      That's okay. Take your time. If you have to take a break,
        just let me know.

A.      Sorry. Um, so I felt someone flipping me over, and um,
        putting his penis in my mouth, basically.

Q.      Okay. Did you resist at that point?

8

A.     Sorry?

Q.     Did you resist at that point?

A.     No. I couldn't move. I couldn't do anything.

Q.     Was anything said by anyone?

A.     No.

Q.     You or him?

A.     No. And that's the last thing I remember. And after, it's
       all black.

Q.     Do you recall whether or not you had vaginal sex?

A.     No.[20]

She next recalls being awakened by a text message from her friend.[21] She realized she

was naked and called her friend to come over right away. He arrived to find her panicking

and crying.[22] She could tell by the way her body felt that she had had vaginal intercourse.[23]

---

[20]Exhibit 1, Plaintiff Depo., pp. 91-94.
[21]Exhibit 1, Plaintiff Depo., p. 94.
[22]Exhibit 1, Plaintiff Depo., p. 100.
[23]Exhibit 1, Plaintiff Depo., p. 102.

## Testimony of Morris

Morris testified as follows:

His date of birth is November 23, 1974, making him 35 years of age (Plaintiff was 22) on the date of the incident.[24] He was married with two children at the time.[25]

On the date in question, he was a patrolman for The Thibodaux Police Department, his actual employer being The City of Thibodaux.[26]  He was working the night shift, from 6 PM until 6 AM. His shift began at 6 PM on a Thursday and ended at 6 AM on a Friday.[27] His assignment that night was to patrol the east side of downtown Thibodaux.[28] He was in a marked unit with overhead lights and sirens and "Thibodaux Police" displayed on the side.[29]

During his shift, he was parked near Last Call when Plaintiff approached, said she had had a couple of drinks and did not want to drive, and requested a ride home.[30] She sat in the back seat for the ride.[31] During the drive, he recalls her saying something about her stomach

---

[24]Exhibit 2, Morris Depo. p. 5.
[25]Exhibit 2, Morris Depo. pp. 6-7.
[26]Exhibit 2, Morris Depo. p. 21.
[27]Exhibit 2, Morris Depo. p. 22.
[28]Exhibit 2, Morris Depo. p. 24.
[29]Exhibit 2, Morris Depo. pp. 26-27.
[30]Exhibit 2, Morris Depo. pp. 32-35.
[31]Exhibit 2, Morris Depo. p. 36.

hurting.[32]  He stopped and opened her door to give her some fresh air. He then continued on to her apartment and parked with his headlights on and engine running in the middle of the parking lot.[33]  He got out and opened her door, and she got out and asked if he wanted to come up for a drink of water.[34]  He was going to get a bottle of water and go back to patrol.[35] He told the dispatcher that the subject is out of the car.[36]  He decided to make sure she got into her apartment and was going to get some water.[37]

When bringing a 22-year-old girl home who claims she has had a few drinks and does not want to drive, he believes it is  good practice as a police officer to make sure she gets into her apartment safely.[38]  He can recall nothing in the policies and procedures that would prohibit him from seeing that she gets into her door safely, nor that would prohibit him accepting the offer of a bottle of water.[39]  When they got inside, she got him a glass of water, then they sat on her bed and talked.[40]  At some point, she laid down and started dozing off, and being that he was a person of caring, he got her a wet paper towel and dabbed her head,

---

[32]Exhibit 2, Morris Depo. p. 38.
[33]Exhibit 2, Morris Depo. p. 43.
[34]Exhibit 2, Morris Depo., p. 43.
[35]Exhibit 2, Morris Depo., p. 45.
[36]Exhibit 2, Morris Depo., p. 45.
[37]Exhibit 2, Morris Depo., p. 48.
[38]Exhibit 2, Morris Depo., pp. 49-51.
[39]Exhibit 2, Morris Depo., pp. 51-52..
[40]Exhibit 2, Morris Depo., pp. 52-53.

which was in his lap.[41]  He had his police radio with him.[42] He was on the east side of his area of patrol anyway, and decided that if something came across the radio he would need to go, but would still sit and visit.[43]

His uniform included his radio, which he is required to monitor at all times while on duty, and a duty belt which carries his gun, Taser, handcuffs and ammunition magazines.[44] He took off his duty belt, but kept his radio on and with him the whole time he was in her apartment.[45] The duty belt is held by Velcro.[46] When he pulls it off, it makes Velcro noise.[47]

According to Morris, she took off her clothes, all but her underwear, he sat down on her bed, and she laid down and put her head on his lap.[48]  He said a couple of times that he needed to go as she rubbed his inner thigh.[49]  She leaned up and kissed him on the mouth and was rubbing his penis through his pants.[50]  She then told him to get a condom from a vanity drawer.[51]  He does not think he was in the bedroom for more than 20 to 30 minutes at this

---

[41]Exhibit 2, Morris Depo., p. 53.
[42]Exhibit 2, Morris Depo., p. 57.
[43]Exhibit 2, Morris Depo., p. 58.
[44]Exhibit 2, Morris Depo., pp. 58-60.
[45]Exhibit 2, Morris Depo., p. 61.
[46]Exhibit 2, Morris Depo., p. 60.
[47]Exhibit 2, Morris Depo., p. 61.
[48]Exhibit 2, Morris Depo., p. 61.
[49]Exhibit 2, Morris Depo., p. 65.
[50]Exhibit 2, Morris Depo., p. 66.
[51]Exhibit 2, Morris Depo., pp. 69-70.

12

point.[52] He got the condom, returned to the room, and they started having sex.[53] His shoes were on and his pants were down, but not all the way off.[54] She was on her hands and knees on the bed, and he was standing up on the floor, entering her from behind.[55] Intercourse went on for a maximum of two minutes.[56] He then stopped because "I'm like, oh, man, I'm on duty. I'm married. I can't be doing this."[57] The radio was there in the bedroom with him the whole time, and he could hear any call of duty that came in.[58] If a call of duty had come in, he would have responded to it.[59]

> Q.    Did you ever get onto the bed?
>
> A.    No.
>
> Q.    So she turns around hands and knees on the bed and - - and you are entering her from behind?
>
> A.    Yes.
>
> Q.    And you did fully enter her?

---

[52]Exhibit 2, Morris Depo., pp. 70-71.
[53]Exhibit 2, Morris Depo., p. 76.
[54]Exhibit 2, Morris Depo., p. 77.
[55]Exhibit 2, Morris Depo., p. 79.
[56]Exhibit 2, Morris Depo., p. 79.
[57]Exhibit 2, Morris Depo., p. 79.
[58]Exhibit 2, Morris Depo., p. 80.
[59]Exhibit 2, Morris Depo., p. 80.

A.      Yes.  Like I said, it was only maybe - - I wouldn't even give it a full minute, two minutes max, and then I stopped because that's when, you know, reality, I'm like , oh, man, I'm on duty. I'm married.  I can't be doing this.

Q.      Did your radio go off or anything?

A.      No, nothing went off.  I just - -

Q.      Did your radio signal a call?

A.      No.

Q.      Your radio was on the whole time?

A.      Radio was on the whole time.

Q.      So you're saying a minute, perhaps two, and then you decided bad idea and - -

A.      Yeah, I'm figuring, well, you know what, I'm on duty.  I ain't supposed to - - you know, I mean, I - - I'm still married even though, we weren't even talking about divorce or anything with my ex-wife and stuff, my wife at the time.

Q.      And while - - while you're there in the bedroom, the radio is there in the bedroom with you, right?

A.      Yes.

Q.      And if a call of duty comes, you would be able to hear it?

A.      Yes.

14

> Q.    And if a call of duty came, I'm assuming you would respond to it.
>
> A.    I'd respond to it.
>
> Q.    Somebody - - if you heard something on the radio, and it said there's a big fight at the Library or - - which is in Thibodaux, you would have stopped everything and gone?
>
> A.    I'm on duty.[60]

He pulled his pants up with the condom still on, put back on his duty belt and left within five minutes after stopping intercourse.[61] He then got back into his unit, which was still running with the lights on in the middle of the parking lot, not in an actual parking spot.[62] He drove to a truck stop because he had to urinate, went into the bathroom, took the condom off and threw it into a dumpster on the way out.[63] From there, he patrolled, worked a traffic accident, then went back to the station to do his paperwork, ending his shift at 6:00 AM.[64] Between leaving her apartment and arriving at the station to end his shift, he remained on duty.[65] He was paid for his entire shift.[66] From the beginning of coming onto his shift,

---

[60]Exhibit 2, Morris Depo., pp. 79-80.
[61]Exhibit 2, Morris Depo., pp. 81-82.
[62]Exhibit 2, Morris Depo., pp. 87-88.
[63]Exhibit 2, Morris Depo., pp. 89-90.
[64]Exhibit 2, Morris Depo., p. 90.
[65]Exhibit 2, Morris Depo., p. 91.
[66]Exhibit 2, Morris Depo., p. 93.

including while he was at Plaintiff's apartment and until he ended his shift, he never did stop monitoring his radio.[67]

Morris was ultimately charged with simple rape, but "dealed to malfeasance in office."[68]

He pled guilty to malfeasance in office because he had intercourse while on duty and while under the control of the policies and procedures and regulations of the department.[69] In fact, the whole time he was in her apartment, in his mind he was still on duty and under the control of those policies and procedures.[70] While in her apartment, from the time his pants were first unbuckled until the time they were back on because he was leaving, was less than 15 minutes in his best approximation.[71]

The last radio contact he had with dispatch before going into Plaintiff's apartment was "I'm clear, ready to go... for any duty".[72] Then he monitored his radio at all times while in the apartment and was ready to respond to any call of duty.[73] While in her apartment with this person he transported home, as a police officer, if he felt she was unsafe for any medical

---

[67]Exhibit 2, Morris Depo., p. 125.
[68]Exhibit 2, Morris Depo., p. 119.
[69]Exhibit 2, Morris Depo., pp. 125-125.
[70]Exhibit 2, Morris Depo., pp. 126-127.
[71]Exhibit 2, Morris Depo., pp. 128-129.
[72]Exhibit 2, Morris Depo., pp. 130-131.
[73]Exhibit 2, Morris Depo., p. 131.

reason and in need of any kind of medical assistance, it would be his duty as a police officer to make the appropriate call for an ambulance.[74]

### Testimony of Lieutenant Steve Tullis

Lieutenant Steve Tullis is a police lieutenant for the Nicholls Police Department.[75] Following the incident, he took a statement from Morris after reading him his rights.[76] Morris stated that he was in downtown Thibodaux and agreed to give Plaintiff a ride home.[77] On the way, Morris recalled that she had to throw up.[78]  Upon arrival to her apartment, she asked him to walk her to the apartment.[79]  He had to open her apartment door for her, and when she got in, she laid down on the bed and passed out.[80]  He started to call an ambulance, but he then put a cold compress on her head and she woke up wanting to have sex.[81]  At first, he resisted, but she began grabbing him and kissing him and performing oral sex on him.[82]

---

[74]Exhibit 2, Morris Depo., p. 131.
[75]Exhibit 3, Tullis Depo., p. 12.
[76]Exhibit 3, Tullis Depo., p. 104.
[77]Exhibit 3, Tullis Depo., pp. 106-107.
[78]Exhibit 3, Tullis Depo., p. 107.
[79]Exhibit 3, Tullis Depo., p. 107.
[80]Exhibit 3, Tullis Depo., p. 108.
[81]Exhibit 3, Tullis Depo., p. 108.
[82]Exhibit 3, Tullis Depo., pp. 108-109.

He had sex with her for about three minutes, then he came to his senses.[83]  He then left, still wearing the condom and threw it away at a truck stop in a dumpster.[84]

As a result of the email he received from Lieutenant Michael Richard, he interviewed Plaintiff the next morning at around 8:00 AM.[85]  She told him that she was drunk and got a ride home from a police officer, remembers semi-conscious sex while she could not move, talk or open her eyes, then falling asleep.[86] They went to the hospital for a pelvic exam and "the kit."[87] He then brought her back to the office for an interview.

### Testimony of Police Chief Craig Melancon

Melancon testified as follows:

He was employed by The City of Thibodaux as Chief of Police for The Thibodaux Police Department from 2004 through December of  2010.[88]  He was Chief of Police on

---

[83]Exhibit 3, Tullis Depo., p. 110.
[84]Exhibit 3, Tullis Depo., p. 111.
[85]Exhibit 3, Tullis Depo., p. 21.
[86]Exhibit 3, Tullis Depo., pp. 22-26, 46.
[87]Exhibit 3, Tullis Depo., p. 31.
[88]Exhibit 4, Melancon Depo., pp. 6-8.

August 26, 2010, the date of the incident at issue herein.[89]   As such, he had final departmental authority on all police department matters.[90]

Morris's duty shift would have been from 6:00 PM on August 26 to 6:00 AM on August 27, 2010.[91] On the night in question, Morris remained on duty until 6:00 AM on August 27, 2010.[92] **It was a custom and policy of the department, and within the scope of a police officer's duties for a police officer on duty to transport an intoxicated person to their home or apartment upon their request.**[93] When a police officer on duty undertook to transport an intoxicated female to her home, policy required that the officer radio in his point of origin and point of destination.[94] When a police officer on duty undertakes to transport an intoxicated female home on request, he is doing so in his capacity as an officer if he follows the policy of calling it in.[95] In this case, the officer did call in his mileage and point of origin.[96]

---

[89]Exhibit 4, Melancon Depo., p. 8.
[90]Exhibit 4, Melancon Depo., p. 9.
[91]Exhibit 4, Melancon Depo., p. 50.
[92]Exhibit 4, Melancon Depo., p. 51.
[93]Exhibit 4, Melancon Depo., pp. 14-15.
[94]Exhibit 4, Melancon Depo., pp. 21-23.
[95]Exhibit 4, Melancon Depo., p. 32.
[96]Exhibit 4, Melancon Depo., p. 33.

On the date in question,  Morris would have been in uniform, including blue pants and shirt, badge and duty holster, holding his weapon, handcuffs, chemical agent, Taser, portable radio, nightstick and telephone. [97]   While on duty, an officer is required to have a radio on his person. While off duty, he is not required to do so.[98]  While on duty, an officer is required to maintain contact through the radio on his person with police dispatch in order to hear any call to him.[99]

In this case, Morris drove Plaintiff to her apartment, called in his final destination and time while Plaintiff was still in his vehicle and put himself back in service as available, then opened the vehicle door for her, she appeared unsteady, and he assisted her up the stairs of her apartment and helped her open the door when she had difficulty doing so.[100] What Morris should have done was called in that he had reached the destination, but was taking the further action of assisting her in getting into her apartment.[101] If he had communicated with dispatch that he was assisting her to her door, that would have been in keeping with department policy.[102]

---

[97]Exhibit 4, Melancon Depo., pp. 34-35.
[98]Exhibit 4, Melancon Depo., p. 35.
[99]Exhibit 4, Melancon Depo., p. 36.
[100]Exhibit 4, Melancon Depo., p. 46-47.
[101]Exhibit 4, Melancon Depo., p. 48.
[102]Exhibit 4, Melancon Depo., p. 52.

Once an officer undertakes to transport an intoxicated female student home, the officer has a duty to do so in a way that protects her safety.[103] If he believed she was in a medically unsafe condition due to intoxication, he would be required to take some form of action such as dispatching an ambulance.[104] If an officer were to bring an intoxicated female to her apartment, assist her in getting inside, see her get into bed and not move after that, get a cold compress to put to her head, make sure that she is responsive and that she assures him that she is fine, then the officer leaves the apartment and communicates that he is leaving and is back available for duty, those actions would be within the acceptable discretionary actions of that police officer as long as he maintained constant communication with the department throughout those activities.[105]

If he reached her apartment, called in that he was available for duty, then proceeded with the same actions without communicating that he was taking those actions, that lack of communication would break policy custom or protocol.[106] However, even if Morris did not communicate to the department that he was taking the further actions of going into the apartment, he was still required to maintain communication with the department by the radio

---

[103]Exhibit 4, Melancon Depo., p. 60.
[104]Exhibit 4, Melancon Depo., p. 62.
[105]Exhibit 4, Melancon Depo., pp. 53-56.
[106]Exhibit 4, Melancon Depo., pp. 56-57.

he carries.[107]  The department has the right to exercise that control over him, that while he is on duty, he must remain in radio contact with the radio that is on his person.  He was also required to have his weapon, badge and radio with him while inside the apartment.[108]

While on his 12-hour shift, an officer is subject to the department's rules and procedures regarding an officer's behavior while on duty.[109] While on duty, the department exercises the right of control of his actions to the extent they must comport with departmental guidelines and rules and policies and procedures.[110]

While inside the apartment, or at any time during his 12-hour shift, Morris was prohibited from drinking alcohol.[111] If he drank alcohol while on shift he would be subject to discipline from the department.[112] During an officer's shift, he is required to maintain radio contact with the department and respond to any call of duty communicated by that contact.[113] While on shift, an officer would be prohibited from going to a girlfriend's house to have sex, going to a movie, going home to watch a movie with his wife, finding a quiet spot on the

---

[107]Exhibit 4, Melancon Depo., pp. 57-58.
[108]Exhibit 4, Melancon Depo., p. 58.
[109]Exhibit 4, Melancon Depo., p. 62.
[110]Exhibit 4, Melancon Depo., pp. 62-63
[111]Exhibit 4, Melancon Depo., p. 60.
[112]Exhibit 4, Melancon Depo., p. 61.
[113]Exhibit 4, Melancon Depo., p. 60.

bayou to go fishing or getting together with buddies to watch TV at a sports bar even if he communicated to the department where he was going and what he was doing.[114]

An officer in custody of an arrestee female is under a duty to assure her safety while in custody, and the same would be true of an officer transporting a female who asked for a ride because of intoxication.[115] Transporting an intoxicated person to their apartment upon request could be considered an official duty within the custom and policy of the department.[116] Officers are encouraged to accommodate those requests if they are not in the middle of some other pressing need.[117]

On the night in question, Morris was driving a marked police unit owned by The City of Thibodaux. Thibodaux Police Department is written on the side of the unit and it has sirens on top and its own radio.[118]  The unit was owned, maintained and fueled by The City of Thibodaux.[119]

An officer transporting an intoxicated person from one location to their home falls within the idea of rendering aid.[120]

---

[114]Exhibit 4, Melancon Depo., pp. 61-62.
[115]Exhibit 4, Melancon Depo., p. 63.
[116]Exhibit 4, Melancon Depo., p. 69.
[117]Exhibit 4, Melancon Depo., p. 70.
[118]Exhibit 4, Melancon Depo., pp. 58-59.
[119]Exhibit 4, Melancon Depo., pp. 68-69.
[120]Exhibit 4, Melancon Depo., pp. 71-72.

23

# THE CITY OF THIBODAUX IS VICARIOUSLY LIABLE AS A MATTER OF LAW

## A.  APPLICABLE LAW

### *Vicarious Liability Generally*

Louisiana Civil Code article 2320 provides for master-servant tort liability, also known as vicarious liability, in pertinent part as follows: "Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed." *Id*.  In *Richard v. Hall,* 2003-1488, pp. 5-6 (La. 4/23/04), 874 So.2d 131, 137-8, the Louisiana Supreme Court explained:

> The premise of vicarious liability is codified in La. Civ.Code art. 2320, which provides an employer is liable for the tortious acts of its "servants and overseers in the exercise of the functions in which they are employed." Vicarious liability rests in a deeply rooted sentiment that a business enterprise cannot justly disclaim responsibility for accidents which may fairly be said to be characteristic of its activities. *Ermert*, 559 So.2d at 476, *citing Ira S. Bushey & Sons v. United States*, 398 F.2d 167, 171 (2d Cir.1968); 2 M. Plainol & G. Ripert, Traité Élémentaire de Droit Civil No. 911 (La.St.L.Inst.Trans.1959); Douglas, Vicarious Liability and the Administration of Risk I, 38 Yale L.J. 584, 586 (1929). In determining whether a particular accident may be associated with the employer's business enterprise, the court must essentially decide whether the particular accident is a part of the more or less inevitable toll of a lawful enterprise. *Ermert*, 559 So.2d at 476, citing 5 F. Harper, F. James & O. Gray, The Law of Torts, § 26.7, at 28 (2d ed.1986). **When considering**

24

which risks the employer must bear under vicarious liability, the proper test bears resemblance to that which limits liability for workers' compensation, because the employer should be held to anticipate and allow for risks to the public that "arise out of and in the course of" his employment of labor. *Ermert*, 559 So.2d at 476, citations omitted. While the course of employment test refers to time and place, the scope of employment test examines the employment-related risk of injury. *Russell v. Noullet*, 98-0816, p. 4 (La.12/1/98), 721 So.2d 868, 871(reh'g denied 1/15/99). The inquiry requires the trier of fact to determine whether the employee's tortious conduct was so closely connected in time, place and causation to his employment-duties as to be regarded a risk of harm fairly attributable to the employer's business, as compared to conduct motivated by purely personal considerations entirely extraneous to the employer's interests.

\* \* \*

The fact that the predominant motive of the servant is to benefit himself or a third person does not prevent the act from being within the scope of employment. *Ermert*, 559 So.2d at 477, citations omitted. If the purpose of serving the master's business actuates the servant to any appreciable extent, the master is subject to liability if the act is otherwise within the service. *Id.* The scope of risks attributable to an employer increases with the amount of authority and freedom of action granted to the servant in performing his assigned tasks.

*Id.*, at 138-139 (emphasis added).

25

The single most important factor to consider in deciding whether there is vicarious liability is the <u>right</u> of the employer to control the work of the employee. *Roberts v. State of Louisiana, Through the Louisiana Health and Human Resources Administration*, 404 So.2d 1221 (La.1981); *Hickman v. Southern Pacific Transportation Company*, 262 La. 102, 262 So.2d 385 (La.1972). In *Roberts*, the Supreme Court emphasized that "the <u>right</u> of control of the time and physical activities in the other party and the existence of a close relationship between the parties determines that one is a servant...." *Id.,* at 1225.

In *Cusimano v. A.S. Spiess Sales Co.*, 96 So. 118 (La. 1923), the Supreme Court noted:

> It is not every deviation from the direct line of his duties on the part of an employee that constitutes a turning aside from his master's business. Duffy v. Hickey, 151 La. 274, 91 South. 733. Nor does the master's liability cease merely because the servant is acting contrary to, or even in defiance of, express instructions from his master, Winston v. Foster, 5 Rob. 113. But the servant must have abandoned and turned aside completely from his business, to engage in some purpose wholly his own, before the master ceases to be liable for his acts.

*Id.*, at 118-119.

26

In other words, "In determining whether vicarious liability attaches, the focus is on the employee's **general activity** at the time of the incident, rather than on specific tortious conduct, and the fact that the act is proscribed or performed **in a forbidden manner** does not remove the act from the scope of employment." *Price v. La. Dept. Of Transp. and Development*, 608 So.2d 203, 210 (La. App. 4th Cir.1992) (emphasis added, *citing Lebrane v. Lewis*, 292 So.2d 216 (La. 1974).

### Police Cases Specifically

A state supervisory official cannot be held for the actions of a subordinate under § 1983 solely on the basis of vicarious liability. *Monell v. Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Barksdale v. King*, 699 F.2d 744 (5th Cir.1983).

The result is different, however, under the pendent state law claims. Under Louisiana law, a parish sheriff is liable in his official, but not personal, capacity as an employer of a deputy, for the deputy's torts in the course and scope of employment. Louisiana Civil Code art. 2320; *Jenkins v. Jefferson Parish Sheriff's Office*, 402 So.2d 669 (La.1981).

In *Applewhite v. City of Baton Rouge*, 380 So.2d 119 (La.App.1st Cir.1979), the Court held that the City of Baton Rouge was liable for its police officer's action in forcing a female to engage in sex against her will while he was performing police duties for the city.  Plaintiff,

who was walking on Scenic Highway in Baton Rouge with two companions, was approached

by Officer Crowe, who was in uniform, on duty, and traveling in a police K-9 unit.  Plaintiff

was ordered into the unit to be taken to jail for vagrancy.  Instead of taking her to jail, they

parked and forced plaintiff to engage in oral copulation and sexual intercourse.  She was then

released.  The officer was later convicted of malfeasance in office.  The City maintained that

the actions of its officer were far removed from the course and scope of his employment and

that it should not be vicariously responsible for sexual abuses committed by its officers.  *Id*.,

at 121.  The Court disagreed, stating:

> We particularly note that Officer Crowe was on duty in uniform
> and armed, and was operating a police unit at the time of this
> incident. He was able to separate the plaintiff from her
> companions because of the force and authority of the position
> which he held. He took her into police custody and then
> committed the sexual abuses upon her in the vehicle provided
> for his use by his employer.
>
> A police officer is a public servant given considerable public
> trust and authority. Our review of the jurisprudence indicates
> that, almost uniformly, where excesses are committed by such
> officers, their employers are held to be responsible for their
> actions even though those actions may be somewhat removed
> from their usual duties. This is unquestionably the case because
> of the position of such officers in our society.
>
> In *Cheatham v. Lee*, 277 So.2d 513 (La.App. 1st Cir. 1973), we
> found that the City of Baton Rouge was responsible for the
> unnecessary actions of a member of its police force who was in
> uniform and armed but who was off duty and was chaperoning
> a private party outside of the city limits of Baton Rouge.

Similarly, in *Bourque v. Lohr*, 248 So.2d 901 (La.App. 1st Cir. 1971), the liability insurer of the City of New Iberia was cast in judgment for certain torts committed by an off duty, uniformed police officer using his private vehicle.

In short, as noted by the district court in its excellent analysis of this problem, where it is found that a law enforcement officer has abused the "apparent authority" given such persons to act in the public interest, their employers have been required to respond in damages. This is particularly true where, as here, the officer is on duty.

As noted in *LeBrane v. Lewis*, 292 So.2d 216 (1974):

"In Louisiana, as elsewhere, an employer (master) is liable for a tort committed by his employee (servant) if, at the time, the servant is acting within the scope of his employment acting, as our Civil Code Article 2320 phrases it, 'in the exercise of the functions in which . . . employed.'   Article 2320; *Blanchard v. Ogima*, 253 La. 34, 215 So.2d 902 (1968); Comment, 33 La.L.Rev. 110 (1972)."

Accordingly, we find that the City of Baton Rouge is responsible for the actions of Crowe in this case.

*Id.*, at 121-122.

The *Applewhite* Case has enjoyed federal appellate court approval and application beyond Louisiana.  See: *Primeaux v. US*, 102 F.3d 1458 (8th Cir.1996).

In *Latullas v. State of Louisiana*, 658 So.2d 800, 94-2049 (La.App.1st Cir.6/23/95), reversing the trial court, the First Circuit similarly held the State vicariously liable for a prison guard's rape of a prisoner on prison grounds while the guard was in charge of the

prisoner work crew.  The guard told the plaintiff/inmate to go with him to clean out semi-abandoned mobile homes in an isolated area on the prison grounds.  Citing *Applewhite*, *supra*, the court reasoned that the guard was able to separate plaintiff from her fellow inmates and commit the act of rape due to the authority bestowed upon him by his employer.  *Id.*, at 804.  The court further reasoned that, even though the rape itself was totally unauthorized by the employer, and motivated by the guard's personal desires, the rape nevertheless occurred while he was at least partly actuated by his purpose of acting for his employer in the control and supervision of inmates, and it was through these duties that this opportunity arose.  *Id.*, at 804-805.

The *Latullas* Court stated:

> Because of the authority bestowed upon him by his employer, Lt. Brown, like the police officer in *Applewhite v. City of Baton Rouge*, 380 So.2d 119 (La.App. 1st Cir.1979), was able to separate Ms. Latullas from her fellow inmates, and commit the act of rape. Even though the rape itself was totally unauthorized by Lt. Brown's employer, and motivated by Lt. Brown's personal desires, the rape nevertheless occurred while he was at least partly actuated by his purpose of acting for his employer in the control and supervision of inmates, and it was through these duties that this opportunity arose.
>
> As the Supreme Court stated in *Ermert v. Hartford Insurance Company*, 559 So.2d 467, 477 (La.1990):
>
> > The fact that the predominant motive of the servant is to benefit himself or a third person does not prevent the act from being within the scope of employment. If the

30

> purpose of serving the master's business actuates the
> servant to any appreciable extent, the master is subject to
> liability if the act is otherwise within the service. So also,
> the act may be found to be in the service if not only the
> manner of acting but the act itself is done largely for the
> servant's purposes.

(Citations omitted.)

Accordingly, we find that the State is vicariously liable for the
actions of Lt. Brown in this case.

*Id.*, at 804-805.

In *Turner v. State*, 494 So.2d 1292 (La.App.2nd Cir.1986), a recruiting officer for the
Louisiana National Guard ("LNG") was invited to the Turner home to discuss with four
young women their joining the LNG. The officer interviewed the women and then deceived
them into believing that he had the authority to conduct a physical exam. He then proceeded
to touch the women inappropriately. After being denied admission to the LNG and upon
learning that the officer was not authorized to conduct the physical, suit was filed.

Liability was imposed because the court found:  Sudduth's battery upon the young
women was closely connected in time, place, and causation to his employment duties. The
sergeant visited the girls in his capacity as a recruiting officer after they expressed a desire
to enter the LNG. The Turner home where the incident occurred was located in Tensas Parish
which was part of the recruiting area assigned to Sgt. Sudduth and the incident occurred

during working hours. During the interview process, he mislead the young women into believing that he had authority to conduct a physical examination. Thus, the tortious conduct committed by Sgt. Sudduth was reasonably incidental to the performance of his duties as a recruiting officer although totally unauthorized by the employer and obviously motivated by his personal interests. Furthermore, the sergeant's actions were so closely connected to his employment duties that the risk of harm faced by the young women was fairly attributable to his employer, who had placed the sergeant in a position of trust and authority in contacting young persons for recruitment into the guard.

In *Lamkin v. Brooks*, 498 So.2d 1068 (La.1937), the Louisiana Supreme Court found that the Town of Lecompte was liable for the tort of its police officer who punched plaintiff in the face, breaking several bones, while investigating two intoxicated persons blocking an intersection outside the jurisdiction of the town.  The *Lamkin* Court reasoned that the altercation "clearly had its roots in [the officer's] performance of his duties as a Lecompte police officer.  The record indicates that, before the night in question, no bad blood existed between the two men.  All of [the officer's] contacts with [plaintiff] that evening occurred in the course of his police duties.  The radio operator instructed him to proceed outside the town's jurisdiction to investigate a complaint. . . . [The officer] wore a police uniform, carried a gun and drove a Lecompte police car.  Under these circumstances, we find that [the

officer's] tortious conduct was so closely connected in time, place and causation to his employment duties as to be regarded as a risk of harm fairly attributable to his employer's business.  Therefore, [the officer] was within the course and scope of his employment at the time he hit [plaintiff] and the Town of Lecompte is vicariously liable to plaintiff for his damages."  *Id.*, at 1071.

In *Price v. Louisiana Department of Transportation and Development*, 608 So.2d 203 (La.App.4th Cir.1993), a Mississippi River Bridge Authority police officer directing traffic struck a motorist in the face after he refused to remove his overheated vehicle from the line of traffic.  The *Price* Court found the Mississippi River Bridge Authority vicariously liable, stating:

> It is well settled that masters and employers are answerable for the damage caused by their servants in the exercise of the functions in which they are employed. LSA-C.C. art. 2320. A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control. *Blanchard v. Ogima*, 215 So.2d 902, 906 (La.1968). In determining vicarious liability, the focus is on the employee's general activity at the time of the accident rather than on the specific tortious conduct, and the fact that an act is forbidden or is done in a forbidden manner does not remove that act from the scope of employment. *Jones v. Thomas*, 426 So.2d 609 (La.1983); *Lebrane v. Lewis*, 292 So.2d 216 (La.1974).
>
> There is no question that Officer Poche was on duty at the time of the altercation with the plaintiffs and was acting in the course

33

> and scope of his employment when he struck Glenn Price. For
> this reason, the MRBA and DOTD, as the employers of Poche,
> are vicariously liable for the damages sustained by Poche [sic].

*Id.*, at 210.

### B.   FACTUAL ANALYSIS

Here, Morris was under the complete right of control of the department while on his shift and in Plaintiff's apartment, and he actually continued to maintain radio contact with the department, was ready to respond to any call of duty and was within his geographical jurisdiction at all times.  Everything he did, with the exception of a very few minutes of unacceptable behavior, according to then-police-chief Melancon, was within compliance of departmental policy.

At all times, the department's right of control remained.  At all times, Morris's radio monitoring continued without interruption.  As in *Applewhite*, *supra*, the very presence of Morris in Plaintiff's apartment was actuated by his capacity as a police officer and the department's policy of transporting an intoxicated person home upon request.  As the *Applewhite* Court stated: "A police officer is a public servant given considerable public trust and authority.  Our review of the jurisprudence indicates, almost uniformly, where excesses are committed by such officers, their employers are held to be responsible for their actions even though those actions may be somewhat removed from their usual duties.  This is

34

unquestionably the case because of the position of such officers in our society. . . . In short, as noted by the district court in its excellent analysis of this problem, where it is found that a law enforcement officer has abused the "apparent authority" given such persons to act in the public interest, their employers have been required to respond in damages.  This is particularly true where, as here, the officer is on duty." *Id.*, at 121-122, holding the City of Baton Rouge liable for officer's action in raping a female he had picked up for vagrancy.

As in *Applewhite*, Morris gained opportunity to do what he did due to the authority bestowed upon him by his employer.  As in *Latullas*, *supra* even though Morris's violating actions were totally unauthorized by his employer, and motivated by his personal desires, the violation occurred while he was at least partly actuated by his purpose of acting for his employer while engaged in departmental policy of bringing an intoxicated person home upon request, and it was through his duties in doing so that his opportunity arose.

Morris was on duty, in full uniform including badge, weapon, duty belt and personal radio, and driving a marked unit when he complied with Plaintiff's request for a ride home. His area of patrol included the east side of downtown Thibodaux.[121] It was a custom and policy of the department, and it was within the scope of Morris' duties to transport an intoxicated person home upon request.[122] Upon arrival, Morris decided to make sure Plaintiff

---

[121]See testimony of Morris, above.
[122]See testimony of then-police-chief Melancon, above.

got into her apartment safely and was going to get some water while there.[123] When bringing a 22-year-old girl home who claims she has had a few drinks, Morris believed it to be a good practice to make sure she got into her apartment safely.[124]  Before leaving his marked unit running with the headlights on in the parking lot, he radioed to dispatch that he was clear and ready to go for any duty.[125]  Morris was on the east side of his area of patrol anyway and decided that if something came across the radio, he would need to go, and he monitored his radio at all times while in Plaintiff's apartment, and he remained in uniform and in possession of his gun, Taser, handcuffs and ammunition magazines.[126] If a call had come in on the radio, he could hear it and would have responded to it.[127] While in her apartment, if he felt she was unsafe for any medical reason and in need of medical assistance, it would be his duty as a police officer to call an ambulance.[128]

While on duty, Morris was required to have his radio and maintain contact with the department through that radio, which Morris did at all times.[129] If an officer were to bring an intoxicated female to her apartment, assist her in getting inside, see her get into bed and not

---

[123]See testimony of Morris, above.
[124]See testimony of Morris, above.
[125]See testimony of Morris, above.
[126]See testimony of Morris, above.
[127]See testimony of Morris, above.
[128]See testimony of Morris, above.
[129]See testimony of then-police-chief Melancon and Morris, above.

move after that, get a cold compress and put it to her head and make sure she is responsive before leaving, communicates with the department that he is leaving and back available for duty, those actions would be within the acceptable discretionary actions of the officer as long as he maintained constant communication with the department throughout those activities.[130]

While on his 12-hour shift, Morris was subject to the department's rules and procedures regarding his behavior while on duty, and he was under the department's right of control of his actions in comporting with departmental guidelines, rules and procedures.[131] While on duty, he was prohibited from and subject to discipline if he drank alcohol, went to a girlfriend's house to have sex, went to a movie, went home to watch a movie with his wife, went fishing or go together with buddies to watch television at a sports bar.[132]

In contrast, transporting an intoxicated person to their apartment upon request was considered an official duty within the custom and policy of the department, and officers are encouraged to accommodate those requests and it falls within the idea of rendering aid.[133]

Under the applicable case law cited above, The City of Thibodaux is vicariously liable for Morris's liability to Plaintiff for her Louisiana law tort claims as a matter of law.

---

[130]See testimony of then-police-chief Melancon, above.
[131]See testimony of then-police-chief Melancon, above.
[132]See testimony of then-police-chief Melancon, above.
[133]See testimony of then-police-chief Melancon, above.

Respectfully Submitted,

s/J. Price McNamara

_____
**J. PRICE McNAMARA  (20291)**
9431 Common Street
Baton Rouge, LA 70809
Telephone: 225-201-8311
Facsimile: 225-201-8313

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of May 2013, I electronically filed the foregoing

pleading with the Clerk of Court by using the CM/ECF system which will send a notice of

electronic filing to all counsel.

s/J. Price McNamara

_____
**J. PRICE McNAMARA**