## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

**JANE DOE**                                           **CIVIL ACTION**

**VERSUS**                                             **NO.: 11-1532**

**FORMER THIBODAUX POLICE OFFICER**        **SECTION: R(5)**
**COREY MORRIS, ET AL**

## STATEMENT OF UNCONTESTED FACTS

**NOW INTO COURT**, through undersigned counsel, comes Plaintiff, **JANE DOE**,

who respectfully submits as undisputed, for purposes of this motion only, the following

Statement of Uncontested Facts in connection with her attached Motion for Partial Summary

Judgment on Vicarious Liability.

1.      On the date in question, Defendant Corey Morris was a patrolman for The

Thibodaux Police Department, his actual employer being The City of

Thibodaux.[1]  He was working the night shift, from 6 PM until 6 AM. His shift

began at 6 PM on a Thursday and ended at 6 AM on a Friday.[2] His assignment

---

[1]Exhibit 2, Morris Depo. p. 21.
[2]Exhibit 2, Morris Depo. p. 22.

that night was to patrol the east side of downtown Thibodaux.[3] He was in a marked unit with overhead lights and sirens and "Thibodaux Police" displayed on the side.[4]

2.     During his shift, he was parked near Last Call when Plaintiff approached, said she had had a couple of drinks and did not want to drive, and requested a ride home.[5] She sat in the back seat for the ride.[6] During the drive, he recalls her saying something about her stomach hurting.[7] He stopped and opened her door to give her some fresh air. He then continued on to her apartment and parked with his headlights on and engine running in the middle of the parking lot.[8] He got out and opened her door, and she got out and asked if he wanted to come up for a drink of water.[9] He was going to get a bottle of water and go back to patrol.[10] He told the dispatcher that the subject is out of the car.[11] He decided to make sure she got into her apartment and was going to get some water.[12]

[3]Exhibit 2, Morris Depo. p. 24.
[4]Exhibit 2, Morris Depo. pp. 26-27.
[5]Exhibit 2, Morris Depo. pp. 32-35.
[6]Exhibit 2, Morris Depo. p. 36.
[7]Exhibit 2, Morris Depo. p. 38.
[8]Exhibit 2, Morris Depo. p. 43.
[9]Exhibit 2, Morris Depo., p. 43.
[10]Exhibit 2, Morris Depo., p. 45.
[11]Exhibit 2, Morris Depo., p. 45.
[12]Exhibit 2, Morris Depo., p. 48.

3.      When bringing a 22-year-old girl home who claims she has had a few drinks and does not want to drive, he believes it is  good practice as a police officer to make sure she gets into her apartment safely.[13] He can recall nothing in the policies and procedures that would prohibit him from seeing that she gets into her door safely, nor that would prohibit him accepting the offer of a bottle of water.[14]

4.      When they got inside, she got him a glass of water, then they sat on her bed and talked.[15] At some point, she laid down and started dozing off, and being that he was a person of caring, he got her a wet paper towel and dabbed her head, which was in his lap.[16]  He had his police radio with him.[17] He was on the east side of his area of patrol anyway, and decided that if something came across the radio he would need to go, but would still sit and visit.[18]

5.      His uniform included his radio, which he is required to monitor at all times while on duty, and a duty belt which carries his gun, Taser, handcuffs and

---

[13]Exhibit 2, Morris Depo., pp. 49-51.
[14]Exhibit 2, Morris Depo., pp. 51-52..
[15]Exhibit 2, Morris Depo., pp. 52-53.
[16]Exhibit 2, Morris Depo., p. 53.
[17]Exhibit 2, Morris Depo., p. 57.
[18]Exhibit 2, Morris Depo., p. 58.

3

ammunition magazines.[19] He took off his duty belt, but kept his radio on and with him the whole time he was in her apartment.[20]

6.     According to Morris, she took off her clothes, all but her underwear, he sat down on her bed, and she laid down and put her head on his lap.[21]  He said a couple of times that he needed to go as she rubbed his inner thigh.[22]  She leaned up and kissed him on the mouth and was rubbing his penis through his pants.[23]  She then told him to get a condom from a vanity drawer.[24] He does not think he was in the bedroom for more than 20 to 30 minutes at this point.[25] He got the condom, returned to the room, and they started having sex.[26] His shoes were on and his pants were down, but not all the way off.[27] She was on her hands and knees on the bed, and  he was standing up on the floor,  entering her

---

[19]Exhibit 2, Morris Depo., pp. 58-60.
[20]Exhibit 2, Morris Depo., p. 61.
[21]Exhibit 2, Morris Depo., p. 61.
[22]Exhibit 2, Morris Depo., p. 65.
[23]Exhibit 2, Morris Depo., p. 66.
[24]Exhibit 2, Morris Depo., pp. 69-70.
[25]Exhibit 2, Morris Depo., pp. 70-71.
[26]Exhibit 2, Morris Depo., p. 76.
[27]Exhibit 2, Morris Depo., p. 77.

from behind.[28] Intercourse went on for a maximum of two minutes.[29]  He then stopped because "I'm like, oh, man, I'm on duty. I'm married. I can't be doing this."[30] The radio was there in the bedroom with him the whole time, and he could hear any call of duty that came in.[31] If a call of duty had come in, he would have responded to it.[32]

7.    He pulled his pants up with the condom still on, put back on his duty belt and left within five minutes after stopping intercourse.[33] He then got back into his unit, which was still running with the lights on in the middle of the parking lot, not in an actual parking spot.[34]

8.    He drove to a truck stop because he had to urinate, went into the bathroom, took the condom off and threw it into a dumpster on the way out.[35] From there, he patrolled, worked a traffic accident, then went back to the station to do his paperwork, ending his shift at 6:00 AM.[36]

---

[28]Exhibit 2, Morris Depo., p. 79.
[29]Exhibit 2, Morris Depo., p. 79.
[30]Exhibit 2, Morris Depo., p. 79.
[31]Exhibit 2, Morris Depo., p. 80.
[32]Exhibit 2, Morris Depo., p. 80.
[33]Exhibit 2, Morris Depo., pp. 81-82.
[34]Exhibit 2, Morris Depo., pp. 87-88.
[35]Exhibit 2, Morris Depo., pp. 89-90.
[36]Exhibit 2, Morris Depo., p. 90.

9.     Between leaving her apartment and arriving at the station to end his shift, he remained on duty.[37] He was paid for his entire shift.[38] From the beginning of coming onto his shift, including while he was at Plaintiff's apartment and until he ended his shift, he never did stop monitoring his radio.[39]

10.     He pled guilty to malfeasance in office because he had intercourse while on duty and while under the control of the policies and procedures and regulations of the department.[40]

11.     The whole time he was in her apartment, in his mind he was still on duty and under the control of those policies and procedures.[41]

12.     While in her apartment, from the time his pants were first unbuckled until the time they were back on because he was leaving, was less than 15 minutes in his best approximation.[42]

13.     The last radio contact he had with dispatch before going into Plaintiff's apartment was "I'm clear, ready to go... for any duty".[43] Then he monitored his

---

[37]Exhibit 2, Morris Depo., p. 91.
[38]Exhibit 2, Morris Depo., p. 93.
[39]Exhibit 2, Morris Depo., p. 125.
[40]Exhibit 2, Morris Depo., pp. 125-125.
[41]Exhibit 2, Morris Depo., pp. 126-127.
[42]Exhibit 2, Morris Depo., pp. 128-129.
[43]Exhibit 2, Morris Depo., pp. 130-131.

radio at all times while in the apartment and was ready to respond to any call of duty.[44]

14.　　While in her apartment with this person he transported home, as a police officer, if he felt she was unsafe for any medical reason and in need of any kind of medical assistance, it would be his duty as a police officer to make the appropriate call for an ambulance.[45]

15.　　**At all relevant times, it was a custom and policy of the department, and within the scope of a police officer's duties for a police officer on duty to transport an intoxicated person to their home or apartment upon their request.**[46]

16.　　When a police officer on duty undertook to transport an intoxicated female to her home, policy required that the officer radio in his point of origin and point of destination.[47] When a police officer on duty undertakes to transport an intoxicated female home on request, he is doing so in his capacity as an officer

---

[44]Exhibit 2, Morris Depo., p. 131.
[45]Exhibit 2, Morris Depo., p. 131.
[46]Exhibit 5, Melancon Depo., pp. 14-15.
[47]Exhibit 5, Melancon Depo., pp. 21-23.

if he follows the policy of calling it in.[48] In this case, the officer did call in his mileage and point of origin.[49]

17.     On the date in question, Morris was in uniform, including blue pants and shirt, badge and duty holster, holding his weapon, handcuffs, chemical agent, Taser, portable radio, nightstick and telephone. [50]   While on duty, an officer is required to have a radio on his person. While off duty, he is not required to do so.[51]   While on duty, an officer is required to maintain contact through the radio on his person with police dispatch in order to hear any call to him.[52]

18.     In this case, Morris drove Plaintiff to her apartment, called in his final destination and time while Plaintiff was still in his vehicle and put himself back in service as available, then opened the vehicle door for her, she appeared unsteady, and he assisted her up the stairs of her apartment and helped her open the door when she had difficulty doing so.[53] What Morris should have done was called in that he had reached the destination, but was taking the

---

[48]Exhibit 5, Melancon Depo., p. 32.
[49]Exhibit 5, Melancon Depo., p. 33.
[50]Exhibit 5, Melancon Depo., pp. 34-35.
[51]Exhibit 5, Melancon Depo., p. 35.
[52]Exhibit 5, Melancon Depo., p. 36.
[53]Exhibit 5, Melancon Depo., p. 46-47.

further action of assisting her in getting into her apartment.[54] If he had communicated with dispatch that he was assisting her to her door, that would have been in keeping with department policy.[55]

19.   Once an officer undertakes to transport an intoxicated female student home, the officer has a duty to do so in a way that protects her safety.[56] If he believed she was in a medically unsafe condition due to intoxication, he would be required to take some form of action such as dispatching an ambulance.[57] If an officer were to bring an intoxicated female to her apartment, assist her in getting inside, see her get into bed and not move after that, get a cold compress to put to her head, make sure that she is responsive and that she assures him that she is fine, then the officer leaves the apartment and communicates that he is leaving and is back available for duty, those actions would be within the acceptable discretionary actions of that police officer as long as he maintained constant communication with the department throughout those activities.[58]

---

[54]Exhibit 5, Melancon Depo., p. 48.
[55]Exhibit 5, Melancon Depo., p. 52.
[56]Exhibit 5, Melancon Depo., p. 60.
[57]Exhibit 5, Melancon Depo., p. 62.
[58]Exhibit 5, Melancon Depo., pp. 53-56.

20.    If he reached her apartment, called in that he was available for duty, then
       proceeded with the same actions without communicating that he was taking
       those actions, that lack of communication would break policy custom or
       protocol.[59] However, even if Morris did not communicate to the department
       that he was taking the further actions of going into the apartment, he was still
       required to maintain communication with the department by the radio he
       carries.[60]  The department has the right to exercise that control over him, that
       while he is on duty, he must remain in radio contact with the radio that is on
       his person.  He was also required to have his weapon, badge and radio with
       him while inside the apartment.[61]

21.    While on his 12-hour shift, an officer is subject to the department's rules and
       procedures regarding an officer's behavior while on duty.[62] While on duty, the
       department exercises the right of control of his actions to the extent they must
       comport with departmental guidelines and rules and policies and procedures.[63]

---

[59]Exhibit 5, Melancon Depo., pp. 56-57.
[60]Exhibit 5, Melancon Depo., pp. 57-58.
[61]Exhibit 5, Melancon Depo., p. 58.
[62]Exhibit 5, Melancon Depo., p. 62.
[63]Exhibit 5, Melancon Depo., pp. 62-63

22.     While inside the apartment, or at any time during his 12-hour shift, Morris was prohibited from drinking alcohol.[64] If he drank alcohol while on shift he would be subject to discipline from the department.[65] During an officer's shift, he is required to maintain radio contact with the department and respond to any call of duty communicated by that contact.[66] While on shift, an officer would be prohibited from going to a girlfriend's house to have sex, going to a movie, going home to watch a movie with his wife, finding a quiet spot on the bayou to go fishing or getting together with buddies to watch TV at a sports bar even if he communicated to the department where he was going and what he was doing.[67]

23.     An officer in custody of an arrestee female is under a duty to assure her safety while in custody, and the same would be true of an officer transporting a female who asked for a ride because of intoxication.[68] Transporting an intoxicated person to their apartment upon request could be considered an

---

[64]Exhibit 5, Melancon Depo., p. 60.
[65]Exhibit 5, Melancon Depo., p. 61.
[66]Exhibit 5, Melancon Depo., p. 60.
[67]Exhibit 5, Melancon Depo., pp. 61-62.
[68]Exhibit 5, Melancon Depo., p. 63.

official duty within the custom and policy of the department.[69] Officers are encouraged to accommodate those requests if they are not in the middle of some other pressing need.[70]

24.     On the night in question, Morris was driving a marked police unit owned by The City of Thibodaux. Thibodaux Police Department is written on the side of the unit and it has sirens on top and its own radio.[71]  The unit was owned, maintained and fueled by The City of Thibodaux.[72]

25.     An officer transporting an intoxicated person from one location to their home falls within the idea of rendering aid.[73]

Respectfully Submitted,

s/J. Price McNamara

_____
**J. PRICE McNAMARA  (20291)**
9431 Common Street
Baton Rouge, LA 70809
Telephone: 225-201-8311
Facsimile: 225-201-8313

---

[69]Exhibit 5, Melancon Depo., p. 69.
[70]Exhibit 5, Melancon Depo., p. 70.
[71]Exhibit 5, Melancon Depo., pp. 58-59.
[72]Exhibit 5, Melancon Depo., pp. 68-69.
[73]Exhibit 5, Melancon Depo., pp. 71-72.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 23rd day of May 2013, I electronically filed the foregoing pleading with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel.

s/J. Price McNamara

_____

**J. PRICE McNAMARA**

13